# THE ESTEBETH.

No. 3519–A.

First Division.  Juneau.

Jan. 29, 1934.,

R. E. Robertson, of Juneau, for libelant.

Hellenthal & Hellenthal, of Juneau, for respondents.

ALEXANDER, District Judge.

This is an action for damages brought by Jessie Patterson as libelant against the motorship Estebeth and James V. Davis, her owner, for damages growing out of an accident that occurred on or about January 1, 1933, aboard that vessel.

The amended libel alleges, in substance, that on or about January 1, 1933, the Estebeth, a vessel of seventy tons, was engaged in carrying passengers for hire, and that libelant was a passenger thereon; that the respondents negligently permitted the floor of the dining room or social saloon to become wet and slippery with water and moisture, and failed to keep installed or in place upon said floor any mats, cleats, or other guard that would prevent libelant from slipping when stepping or walking upon the floor, or to keep said dining room or social saloon sufficiently and adequately lighted to permit libelant to know the aforesaid condition of said floor before she stepped thereon; that respondents did not notify or warn libelant that the floor of said dining room or social saloon was wet or slippery or in such condition as would be dangerous or unsafe should she step or walk thereupon at said time, or that libelant should remain in her stateroom and should not depart therefrom and should not enter said dining room or social saloon, and did not furnish or provide libelant's said stateroom with any chamber, slop jar, or other utensil whereby she, without leaving her stateroom, would be enabled to answer calls of nature, and did not provide any means with which she could obtain or call for the same without leaving her stateroom; that libelant, in response to an imperative call of nature, left her stateroom for the purpose of visiting the ladies' toilet, which was situated on the opposite side of the vessel from where her stateroom was situated, and, while passing through the dining room or social saloon on her way to the toilet, slipped and fell, thereby injuring herself.

It is also alleged that it was unsafe and impossible for her to reach said toilet by traversing the deck around the stern

of the vessel by reason of the ice and slippery condition of the outside or promenade deck of said vessel.

It is then alleged that, by reason of the fall suffered by her aforesaid, she suffered the breaking and fracture of the bones in her left wrist or lower part of her left arm and the breaking of the bones of her thumb on her left hand and severe bruises to her left hand, wrist, and shoulder, and became sick, lame, and sore, and suffered great mental and physical pain and anguish, and has so continued from January 2, 1933; that said injuries have permanently disabled and incapacitated her left hand, wrist, and shoulder to an extent of 50 per cent. or more of the use she had of them before sustaining said injuries, for which she asks damages in the sum of $10,000, and in addition thereto the sum of $716 which she alleges she expended for necessary medical, hospital, and nursing services and attention on account of said injuries.

All of these allegations, except the ownership and registry of the motorship Estebeth, that she was a vessel of seventy tons' burden, that it was a common carrier of passengers for hire and libelant a passenger thereon, and that the libelant fell on said vessel and injured herself, are denied.

The libelant then sets up in its further answer to the libel; that at the time of the accident said vessel was fully manned and equipped as required by law; that on the day mentioned and previous to the vessel's arrival at Funter Bay it was snowing and freezing, and there was a strong northwest gale blowing on Chatham Straits, which caused the waters of Chatham Straits to become very rough and the spray to freeze on said Estebeth; that, while said vessel was at Funter Bay, the captain and crew of said vessel cleared the deck of said vessel of ice and snow and cleaned the floor of the galley (or dining saloon) and dried the same, and advised all passengers aboard said vessel, including the libelant, that, if they had any occasion to leave their rooms or move about on said ship, to do so while the

vessel was in port at Funter Bay, and warned them that they would shortly encounter very rough seas, during which time they could not safely move about the ship; that shortly after they left Funter Bay they encountered very rough seas with a northwest gale blowing; that the libelant thereafter, totally disregarding the warning given at Funter Bay, negligently and without cause left her stateroom, at which time a northwest gale was blowing and the sea was very rough as aforesaid, and negligently and without steadying herself with her hands or otherwise, and without exercising any care, although she well knew that the sea was rough, stepped into the galley without paying any attention and without using proper precaution, and that, after the libelant stepped into the galley, a heavy swell hit the Estebeth and caused the vessel to lurch; that the lurch of the vessel caused by the storm caused her to fall and injure herself as aforesaid.

It is also alleged in the second further answer that, after leaving Funter Bay, while they were encountering very rough seas and with a northwest gale blowing, the libelant negligently and with Cuban-heeled leather shoes on her feet left her room, and negligently, without watching her step or taking other precautions, stepped into the galley without paying any attention and without using proper precaution in ascertaining whether said floor was wet or dry, and negligently stepped upon and stood upon said floor without looking to see if it was wet or dry or stepped thereon knowing it to be wet, if the same was wet, while said galley was well lighted, and that negligence of the libelant directly contributed to the injury suffered by her; that the respondents did everything within their power to give relief to the libelant and put splints on her arm and offered to procure a doctor and hospital for her, which the libelant declined; that the libelant aggravated her injury by moving around from place to place and by her failure to remain still until such time as the bones of her wrist would have sufficient time to heal; that the break caused by libelant's fall was a simple break and would in a short time have

healed and caused her no further trouble, but the libelant aggravated the injury by failure to remain quiet, etc.

■ It should be observed in the beginning that it is incumbent upon the libelant to prove every material allegation of her complaint by a preponderance of the evidence.

■ The libelant testified, in substance, that she had done a great deal of traveling in both large and small ships and had never been seasick or fallen before; that her husband was an engineer on one of the large ships plying the Pacific, and that she had traveled with him extensively; that she had been in Alaska before and had taught school to the westward and made several trips there; that she had made at least two previous trips on the Estebeth, and was familiar with its arrangement and knew most of its officers and crew; that on the morning in question she left her stateroom about 10 o'clock and started to go around the stern of the vessel to the women's toilet on the opposite side of the boat, but found it impossible to go around that way on account of the ice on the deck, particularly at the stern of the vessel, and so went back to the dining saloon, intending to go through there; that she had difficulty in opening the door, and a young man passenger named Danner opened the door for her and held it open while she entered; that she stepped inside, and, while in the act of taking the second step, she slipped and fell and injured herself as alleged, due to the wet and slippery condition of the floor.

That she fell and injured herself is admitted. The libelant said in her direct examination that the floor was covered with a cork linoleum which was wet in puddles from tracked-in snow, etc., but that she did not know until after she had slipped or fallen that the floor was wet or slippery. On her cross-examination, she also testified that she did not know whether the floor was wet or dry before stepping inside, but saw that the floor was wet after she got inside and before she slipped. She, however, admitted that the room was well lighted and that she could have seen had she

looked. I do not, however, attach much importance to this part of the testimony, as all of the witnesses agree that there was some moisture carried into the galley or dining saloon on the feet of the passengers and crew coming and going. The testimony as to the amount of moisture there was on the floor was the subject of much question, and none of the witnesses, except the libelant and one of her witnesses, testified that there was any moisture on the floor except that brought in by the passengers and members of the crew on their feet, which consisted merely of occasional footprints. On the other hand, the great preponderance of the testimony showed that, while the ship was in Funter Bay, the entire deck had been cleared of ice, and the deck salted down, and that almost immediately after breakfast, and before the libelant's entrance, the cook had wiped up the dining room floor.

The evidence further shows that the fall of the libelant happened almost simultaneously with the lurch of the ship, even the libelant admitting that the ship was both rolling and lurching all the time from the storm and the consequent roughness of the water. The manner of the libelant's fall and her position after the fall also bear out the conclusion that her fall was caused by the lurch of the ship rather than by slipping due to the condition of the floor. All the evidence shows that she fell almost directly to the left and at a right angle to the position in which she was standing at the time of the fall, and I am inclined to agree with counsel for the respondents that, had her fall been occasioned by slipping upon a wet or slippery floor, she would have fallen forward or backward, and most likely backward, rather than to have fallen violently to one side, as she did. If such was the case, as I think the evidence conclusively shows, I do not think that any one will seriously contend that the ship can be held liable for her fall, unless the ship was negligent in some other respect, which I do not find.

There was considerable evidence about the failure to provide mats or cleats or other guards that would prevent

the libelant from slipping and falling, but there was no evidence offered by the libelant to support her theory that such safeguards were usual or necessary or that they would have made the floor on which she claims to have slipped safer. On the other hand, there was considerable testimony in behalf of the respondents to the effect that such equipment had been tried out on the ship and found to be more dangerous than helpful, and had been discarded on that account. The local inspector for the government testified that in his opinion mats or cleats would not have made the floor safer. He also testified that the vessel was fully equipped with all the safeguards required by law; that the floor covering of the dining saloon was of battleship linoleum, which had been adopted by the government as the standard floor covering for the navy and merchant marine, and was generally used by ships for that purpose.

Nor does the evidence support the other allegations of negligence. It is admitted by all, including the libelant, that the dining room was well lighted, and that she could see without difficulty everything in the room, including the condition of the floor.

The allegations that respondents failed to provide her stateroom with chamber or slop jar that might be used in answering calls of nature, and did not provide any means by which she could obtain or call for the same without leaving her stateroom, likewise fail to impress and fail for lack of proof.

At the suggestion of counsel, I was taken for an inspection of the boat during the trial, and there found, as shown by the evidence, that there were but two staterooms for passengers on the main deck. These adjoined the dining saloon forward. Both are small, as of necessity they must be in a small vessel such as the Estebeth, being barely long enough for the two wall bunks, one above the other, and not more than two feet of space in front of the bunks. The impracticability of trying to keep a slop jar or chamber in the stateroom was fully explained by the boat's officers,

and to my mind the reasons offered were sound. The officers also explained the lack of call bells by the fact that the boat was small, only sixty-five feet long over all, and some seventeen feet wide; that a call could be heard almost anywhere on the deck level. They further explained that the stateroom of libelant was located between the dining room and the purser's quarters and separated by only very thin board partitions; that a knock on either wall could have been heard and would have been answered by some of the boat's officers; that the purser's quarters were both his office and sleeping quarters, and that he was in there almost constantly. The libelant admitted, however, that although familiar with the plan of the ship and its construction, she made no effort to call any one in any way to bring her the convenience she complains was not furnished. On the other hand, she makes light of the storm conditions, which all agree then existed, and started to the toilet without an apparent thought of danger to herself. Even the lurching of the ship, which the overwhelming testimony shows to have caused her fall, did not sufficiently impress her to cause her to remember that there was any distinct lurch or motion of the vessel at the time. Others aboard were not such good sailors. The native boys aboard, who were called as her witnesses, freely admitted that the sea was rough. "Terribly rough," said Grant, so rough he could not get around outside, so stuck to the dining room. This is further borne out by the testimony of the witness Warner, who testified that, after Mrs. Patterson's arm had been set and bandaged, she lay down on one of the bunks in the dining room, and that he sat beside her "to hold her on," and that he had to brace himself to maintain his position and keep her from rolling off.

Ships of the size and character of the Estebeth are neither supposed nor required to furnish the conveniences and safeguards required of larger vessels, because from their size and the very nature of things it is impossible for them to do so. To hold otherwise would make it impos-

sible for vessels of the size and character of the Estebeth to operate.

I am therefore of the opinion that the libelant's fall and consequent injury was not due to any negligence upon the part of the respondent, but was due solely and entirely to the lurching of the ship, caused by the storm then in progress, and for which the respondent is not liable.

The evidence further shows that the ship's officers did all in their power to minister to the libelant's injuries and to relieve her distress and suffering. The cook, who was standing near by when libelant fell, immediately went to her assistance and called the purser, who had had wide experience as a first-aid man, and he came, and, after finding that the libelant's arm was broken, immediately proceeded to set it and put splints on it, and did such an effective job that both of the physicians who testified stated that the setting was a perfect one, and that they could not have done a better job themselves. Dr. Pigg, who was called as a witness by the libelant, said that had he been in Dr. Dawes' place, and, after having the arm X-rayed as Dr. Dawes did and examining the X-rays, he would have done exactly as Dr. Dawes did, viz. leave the arm alone and let nature take its course.

As to what happened after the libelant left here and before her arrival in California, there cannot be much speculation. The libelant left here after consulting her physician as to the advisability of making the trip, and from her testimony did everything in her power to prevent further injury to her arm, and in this I think she succeeded. The X-rays taken by the doctors in California, and on which they base their diagnoses and subsequent treatment, still show her arm in the same condition as when the X-rays were taken here, and what reason there was for breaking her arm over or doing anything else with it except to let it alone and let nature take its course I am unable to fathom. I cannot say that I blame the libelant particularly for going to a doctor after her arrival in California, because she was

undoubtedly still suffering much pain and inconvenience from her arm and may have felt that out of an abundance of caution she should see a doctor about it again, or she may have thought that a doctor could relieve her of some of the pain she was then suffering, but, however that may be, if her arm was properly set before she left here, what happened thereafter as a result of her going to other doctors could in no event be chargeable to the respondents, nor, for the same reason, could any of the expense incurred in that behalf be recovered. In fact, if the injury was caused, as we think it was caused, by the lurch of the ship, respondents would not be responsible for her injuries, nor for anything incidental thereto, except to see that she had the best care available until she could be landed where she could receive proper care and attention, and this, we think, was done.

It therefore follows that judgment herein must be for the respondents, and it is so ordered; and respondents' counsel may prepare findings and judgment accordingly.